~FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

99 MAR 11 AM 9: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

HIRAM CLAUDE McMURTRIE,          }
                                 }
        Plaintiff,               }
                                 }
v.                               }          CASE NO. CV-97-B-1224-NW
                                 }
FLORENCE CITY BOARD OF           }
EDUCATION and GERALD             }
JOHNSON,                         }          **ENTERED**
                                 }
        Defendants.              }          MAR 1 1 1999

## MEMORANDUM OPINION

Currently before the court is the defendants' Motion for Summary Judgment. Upon consideration of the record, the submissions of parties, the argument of counsel, and the relevant law, the court is of the opinion that defendants' Motion is due to be granted.

This action arises from the removal of Hiram Claude McMurtrie (hereinafter "McMurtrie" or "plaintiff") in May 1995 from his positions as head baseball coach and assistant football coach at Coffee High School in Florence, Alabama.[1] McMurtrie contends that Defendant Gerald Johnson (hereinafter "Johnson"), principal of Coffee High School, recommended McMurtrie's removal to Dr. Edison D. Barney (hereinafter "Barney"), Superintendent of Florence City Schools, in retaliation for the opposition to Johnson's appointment as principal of Coffee High School in 1993 by McMurtrie and his wife.

---

[1] McMurtrie only lost his coaching supplement, and his teaching contract was not affected.

McMurtrie's original claims included allegations of denial of procedural due process and conspiracy. (Pl.'s Compl.). McMurtrie originally sued the Florence City Board of Education (hereinafter "the Board"), Barney, Johnson, and the five members of the Board who were in office at the time of McMurtrie's removal. On March 16, 1998, the court granted defendants' motion for Partial Judgment on the Pleadings and dismissed McMurtrie's procedural due process and conspiracy claims. On May 11, 1998, the court granted McMurtrie's motion to dismiss Barney and the Board members.

At the time the summary judgment motion was filed, the court had before it McMurtrie's 42 U.S.C. § 1983 retaliation claim against Johnson and the Board and his state law claim alleging that Johnson had made false and defamatory statements concerning his job performance as coach. As McMurtrie concedes that summary judgment is due to be entered in favor of the defendants on his defamation claim (Pl.'s Br. at 20), this memorandum opinion will address only McMurtrie's First Amendment retaliation claim. .

## I. FACTUAL SUMMARY[2]

McMurtrie was first employed by the Board in 1989 as a teacher of special education at Coffee High School. (Pl.'s Dep. at 44). In 1993, he was transferred to Hibbett Middle School as a teacher of mentally disabled students where he remained until 1996. (*Id*. at 46-48). In addition to teaching special education, McMurtrie was a coach at Coffee High School. (*Id*.). In 1989-90, he was assistant varsity football coach and track coach. (*Id*. at 47). In 1990, he dropped track, became head baseball coach, and was moved from assistant varsity coach to freshman coach in

---

[2] All reasonable inferences are drawn in favor of the plaintiff.

football. (*Id.*). For school years 1992-93, 1993-94 and 1994-95, he continued as head baseball coach, but returned to the position of assistant varsity coach in football.[3] (Pl.'s Dep. at 46-48). McMurtrie's wife, Deborah, also served as a teacher at Coffee High School. (*Id.* at 44).

In 1989, when McMurtrie was first employed at Coffee High School, Buddy Moore was the principal and Johnson was an assistant principal. (*Id.* at 61). In the Fall of 1992, Moore left to become Adjutant General of the Alabama National Guard. (*Id.* at 61). The superintendent at the time was Dr. Thomas Taylor, and he interviewed candidates, including Johnson, to replace Moore as Coffee High School principal. (Barney Dep. at 35). Taylor recommended assistant principal Bob Grissett to serve as interim principal, but Grissett was not a candidate to permanently replace Moore. (Strickland Dep. at 10-11; Barney Dep. at 35). After Dr. Taylor resigned effective June 1993, Barney replaced him as superintendent. (Johnson Dep. at 14; Merritt Dep. at ll).

Barney began a new application process for the Coffee High School principal position. (Johnson Dep. at 115). He established a committee to interview the candidates and to collectively reach a decision. Johnson was selected unanimously, and Barney recommended him to the Board. (Johnson Dep. at 114-115; Barney Dep. at 35, 37). Johnson was selected and became principal at the beginning of the 1993-94 school year. (Johnson Dep. at 19, 114).

In the spring or early summer of 1993, after Grissett was named interim principal and while a permanent principal was being selected, McMurtrie and his wife went to the office of then Superintendent Taylor. (Pl.'s Dep. at 80-81). Mr. McMurtrie had a concern regarding Johnson's

---

[3] In 1993-94 and 1994-95, although he taught at Hibbett, he continued to coach at Coffee High School.

temper and his disciplining of kids, especially black males. (*Id* at 84-85). McMurtrie told Taylor that he had taken students to Johnson for discipline reasons and Johnson had cursed and was loud. (*Id*. at 86-88). Mrs. McMurtrie says she told Taylor how Johnson had cursed the kids, had cursed her personally and that he had an explosive temper. (D. McMurtrie Dep. at 91). Mrs. McMurtrie also told Taylor that Johnson had an "attitude" toward her after she told him she was not satisfied with his discipline of a young man who had cursed her. (*Id*. at 22-23). She told Taylor it was obvious that Johnson did not like her. (*Id*. at 94). After Barney became superintendent and before he recommended Johnson's appointment to the Board, Mrs. McMurtrie went to see him to discuss Johnson, but this time plaintiff did not participate. (*Id.* at 136-137). She told Barney that Johnson had been abusive, that he had a bad temper and that he was inconsistent with his discipline. (*Id*. at 137).

In the fall of 1993, after Johnson became principal of Coffee High School and shortly after Mrs. McMurtrie had visited Barney, McMurtrie was named defensive coordinator of the football team. (Pl.'s Dep. at 110). Johnson expressed concerns, but did not block the appointment. (*Id*.). In November or December 1993, Mr. and Mrs. McMurtrie complimented Johnson on the job he was doing. (Johnson Dep. at 84). In the spring of 1994 Fred Riley, the head football coach at Coffee High School for two years, resigned under pressure from Johnson.   His team had won only one game the first year and one the second, and parents of football players were complaining. (Johnson Dep. at 181-182). [4]

_____

[4] There is no evidence that Riley had opposed Johnson's appointment as principal, but, as noted, McMurtrie had opposed Johnson's appointment. (Pl.'s Dep. at 82-86).  In the spring of 1994, however, Riley lost his coaching position while McMurtrie kept his position. (*Id*. at 120).

- 4 -

Riley was replaced as head football coach and athletic director by Gerald Hill (hereinafter "Hill"). (Hill Dep. at 37). In the fall football season, McMurtrie kept his position as defensive coordinator. (Hill Dep. at 41). There is no evidence that Johnson made any effort to get Hill to remove, demote or take any adverse action against McMurtrie. Hill did not hear that the McMurtries had opposed Johnson's appointment as principal until McMurtrie's lawsuit was filed in May 1997. (Hill Dep. at 34).

On the first day of spring training in 1995, Hill told McMurtrie that he would remain as an assistant varsity football coach during spring training, but that he would no longer be defensive coordinator. (Hill Dep. at 41-43). Hill disagreed with McMurtrie's performance as defensive coordinator because Hill felt McMurtrie ran too much of an blitzing defense and was not putting in enough time. (Hill Dep. at 46). McMurtrie testified he never noticed any fundamental philosophical difference between his views and Hill's and believed he was following Hill's game plan. (Pl.'s Declaration ¶ 4). While McMurtrie was surprised by the "demotion" he had no problem with it. (*Id.*). He even asked Hill to be his assistant baseball coach. (*Id.*).

In the spring of 1995, several parents complained to Johnson regarding McMurtrie's practices as head baseball coach. Donna Morgan and others complained that the lack of a junior varsity team kept the freshmen from getting to play. (Morgan Dep. at 15-20; Johnson Dep. at 207-208; Hill Dep. at 210). Marilyn Burleson was upset that her son Matt had been required to do sit-ups for an extended period. (Burleson Dep. at 43; Johnson Dep. at 252, 266, 282, 299). Jeff Quillen told Johnson that McMurtrie was inconsistent and harsh. (Quillen Dep. at 13, 15, 43, 71). One parent wanted McMurtrie fired immediately. (Hill Dep. at 222). Several juniors on McMurtrie's team said they would not play baseball the next year unless there was improvement.

(Johnson Dep. at 338; Hill Dep. at 126).

On May 1st, Johnson gave Barney a list of teachers whose contracts he was considering recommending non-renewal. The list included McMurtrie, but the only nonrenewal with regard to McMurtrie was in football. (Barney Dep., Ex. 7). Johnson told Barney that Hill had a problem with McMurtrie coaching football and they were still looking at the baseball position. (Johnson Dep. at 360). On April 25th Hill told Lamar Goodwin, head basketball coach that McMurtrie would not be coaching football the next year. (Goodwin Dep. at 82). On May 3rd or 10th, Goodwin met with Johnson and Hill and suggested McMurtrie as his assistant basketball coach. Hill replied "if he doesn't coach football, he's not going to coach anything, as far as I'm concerned." (Goodwin Dep. at 85).

On May 12, 1995, Johnson, Hill, McMurtrie and assistant baseball coach, Bobby Tate, held a meeting. (Hill Dep. at 162). Hill raised the issue of McMurtrie not having a junior varsity program and also brought to McMurtrie's attention the complaints of the students. (Hill Dep. at 162, 171; Johnson Dep. at 210-212). McMurtrie does not remember Johnson bringing anything to his attention during the meeting. (Pl.'s Dep. at 150-151).

At McMurtrie's request, a second meeting was held on May 15th with McMurtrie, Johnson and Hill attending. (Pl.'s Dep. at 161). Immediately prior to this meeting, Hill told Johnson that he could not work with McMurtrie in football, but he had no problem with McMurtrie remaining as baseball coach. (Hill Dep. at 213). McMurtrie came to the meeting with a list of concerns, and the meeting did not go well. (Pl.'s Dep. at 170). He presented his attorney's card and said he was going to fight them. (Pl.'s Dep. at 174, 177). McMurtrie told Hill that he had no respect for him and Hill told McMurtrie that he was a backstabber who only looked out for himself. (Pl.'s Dep.

- 6 -

at 177, 192).  Both men were upset by the meeting, and McMurtrie proposed his resigning as an assistant football coach, but remaining as a baseball coach.  (Pl.'s Dep. at 187, 192-193; Hill Dep. at 219, 239).  McMurtrie also proposed that he be allowed to bypass Hill and go directly to Johnson in every baseball decision.  (Id.).  Hill told McMurtrie that, as far as he was concerned, McMurtrie would not coach anything.  (Pl.'s Dep. at 192; Hill Dep. at 218, 219, 239).  McMurtrie agreed that it would be very difficult for them to work together.  (Pl.'s Dep. at 217).

After the meeting, Hill recommended that McMurtrie not coach anything at Coffee High School.  (Hill Dep. at 253-254).  Johnson told that Hill that he (Hill) was in charge of the athletic department and "if that's what you want to do, that's what I'll recommend."  Johnson made the recommendation to Barney that McMurtrie's supplemental coaching contract not be renewed.  (Hill Dep. at 254; Pl.'s Ex. 3 Johnson Dep.).  McMurtrie told Johnson that Hill was the real culprit behind his non-renewal, but that he did not believe he and Hill could work together.  (Pl.'s Dep. at 198, 217).

Before Barney recommended the non-renewal of McMurtrie's coaching supplement to the Board, Barney held a meeting with Hill and Johnson.  (Barney Dep. at 83-84).  Hill told Barney what had happened and said he could not work with McMurtrie.  Johnson concurred.  (Id. at 87).  Barney told them that he would need to have this recommendation in writing and he wanted them to share their concerns with McMurtrie.  (Id.).  Barney received the recommendation of the athletic director and the principal, and then recommended non-renewal to the Board.  (Id. at 93).

On May 23rd, the Board agreed to Barney's recommendation.  (Def. Ex. 1 to Pl.'s Dep.).  In the same meeting, the coaching contracts for the basketball coaches at Bradshaw High School

- 7 -

and Coffee High School,[5] the football coach at Bradshaw and the women's basketball coach at

Bradshaw also were not renewed. (Pl.'s Dep. at 120-122). Before agreeing to non-renew

McMurtrie's coaching supplement, the Board held an executive session and inquired why the

move was being made. (Hughes Dep. at 39-61). Board member Hughes voted in favor of the

recommendation on McMurtrie, but against two other coaching non-renewals. (Hughes Dep. at

53; Killen Dep. at 16-20; Merritt Dep. at 26-29). Other Board members from time to time

refused to support recommendations of the Superintendent. (Strickland Dep. at 80).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence

indicate that "there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The

party asking for summary judgment bears the initial burden of showing that no genuine issues

exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

---

[5] Florence has two high schools.

for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

McMurtrie asserts a claim under 42 U.S.C. § 1983 for non-renewal of his coaching contracts in retaliation for his and his wife's exercise of their right to free speech under the First Amendment. He does not contend that Barney or the Board members harbored retaliatory motives. Indeed, he dismissed them as defendants. Instead, he contends that Johnson recommended McMurtrie's non-renewal to Barney in May 1995 because McMurtrie and his wife met with former Superintendent Taylor, and his wife met with Superintendent Barney in 1993, and opposed Johnson's appointment as principal. The defendants' motion for summary judgment asserts that: 1) the comments of Mr. and Mrs. McMurtrie to Superintendents Taylor and Barney were not matters of public concern and thus, were not protected by the First Amendment; 2) applying the required balancing test, the interest of the Board in efficiency of its employees predominates; 3) there is no substantial evidence that the speech in question played a substantial role in McMurtrie's non-renewal; 4) even if the McMurtries' comments did motivate Johnson to recommend non-renewal, McMurtrie's claim against the Board fails because Johnson's decision was subject to meaningful administrative review; and 5) Johnson is entitled to qualified immunity.

## A. FIRST AMENDMENT RETALIATION

The Eleventh Circuit has developed a four-part test to determine whether an employee has been discharged in retaliation for engaging in protected speech. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221 (1994). First, the court must determine "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Id.* (citations omitted). This involves an examination of the content, form and context of the statement, as revealed by the whole record. *Id.; Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Second, if the speech involves a matter of public concern, the court weighs the employee's free speech interests against the "interest of the state, as an employer, in promoting the efficiency of the public service it performs through its employees."[6] *Morgan,* 6 F.3d at 754 (citations omitted). If the plaintiff succeeds in the first two prongs of the test, it is left to the fact-finder to determine "whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." *Id.* (citations omitted). Finally, if the employee shows that the speech was a "substantial motivating factor," the state can still avoid liability if it can "prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* (citations omitted).

The first two parts of the test answer the question of whether the speech was protected, as a matter of law. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995). The second two parts of the test are questions of fact that address the issue of causation. *Id.* As the Eleventh Circuit noted, also in the context of a First Amendment retaliatory discharge

---

[6] This is the *Pickering* balancing test. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).

claim: "Where causation is lacking, an employee's claim of retaliatory discharge must fail and it is unnecessary to consider the other three elements." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

The first part of the test involves a determination of whether the content of the activity claimed to rise to the level of "free speech" merely concerns a "topic" of public concern, or whether the content of the speech reveals an attempt to address a matter of public concern in a form outside the context of the individual's own personal interest in his or her job. *Morgan*, 6 F.3d at 753-55. As the court said: "Absent extraordinary circumstances . . . First Amendment protection remains unavailable when 'a public employee speaks not as a citizen upon matters of public concern, but as an employee upon matters only of personal interest . . .'" *Id.* at 754. (citations omitted). "A court must therefore discern the purpose of the employee's speech--that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." *Id.* The speech is judged by whether, under all the circumstances, it concerned normal internal business or a personal grievance, or it took the form of the employee acting in the role of and expressing the concerns of a private citizen. *Watkins v. Bowden*, 105 F.3d 1344, 1352 (11th Cir. 1997); *Maples v. Martin*, 858 F.2d 1546, 1552-53 (11th Cir. 1988). Where the speech more closely resembles a personal grievance than a public concern, it is not protected. *See Williams v. Alabama State University*, 102 F.3d 1179, 1183 (11th Cir. 1997).

None of the events described by McMurtrie, as evaluated under these tests, address matters of public concern. As observed in *Connick*, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149. Undoubtedly, the selection of a high school principal is of interest to

- 11 -

the public. As noted by the Eleventh Circuit, however, "the mere fact that the topic of the employee's speech [is] one in which the public might or would have had a great interest is of little moment."[7] *Morgan*, 6 F.3d at 754. The important inquiry is the purpose of the plaintiff's speech--was it designed to raise issues of public concern or to further the plaintiff's own private interests. *See id.*

In this case there are no facts from which it is reasonable to infer that any of the concerns raised by Mr. and Mrs. McMurtrie with Superintendent Taylor and by Mrs. McMurtrie with Superintendent Barney addressed matters of public concern. The content, form, and context of plaintiff's speech does not show it to be protected. The context of the speech of plaintiff and his wife was never outside their duties as employees of the Board. In both conversations, they merely expressed private disagreement with Johnson's treatment of them and to some extent students. McMurtrie told Taylor he had taken kids to Johnson and Johnson had cursed in the presence of the kids. Mrs. McMurtrie added that Johnson had cursed her personally. She said Johnson had an "attitude" toward her and that it was obvious Johnson did not like her. She told Barney that Johnson was abusive, had a bad temper and was inconsistent with his discipline.

This speech, in essence, told the Superintendent how Johnson's methods affected the McMurtries as employees. There is no indication that the speech was designed to improve public awareness or was made for the benefit of the public. McMurtrie and his wife were employees

---

[7] It should be noted that the speech in *Morgan* involved complaints of sexual harassment. While the court noted that sexual harassment was a "matter of important social interest," the court upheld the grant of summary judgment as to the plaintiff's First Amendment claim because the plaintiff was speaking out of personal interest and not addressing the harassment as a matter of "public concern." *See Morgan, 6 F.3d at 754-55.*

who spoke on issues affecting their role as employees. While they have an intense interest in how
they were treated by Johnson, these were matters of personal interest. As the *Connick* Court
stated:

> When a public employee speaks not as a citizen upon matters of
> public concern, but instead as an employee upon matters only of
> personal interest, absent the most unusual circumstances, a federal
> court is not the appropriate forum in which to review the wisdom
> of a personnel decision taken by a public agency.

461 U.S. at 147 (citations omitted). The speech at issue did not address a matter of public
concern.[8]

The court also notes that even drawing all reasonable inferences from the evidence in
plaintiff's favor, plaintiff has not presented sufficient evidence on which a jury could reasonably
find that the criticisms made to Taylor and Barney in 1993 played a "substantial part" in the
decision to remove plaintiff as coach in 1995. McMurtrie has shown that in the spring of 1993,
while Johnson was assistant principal, he questioned the decision of head coach Fred Riley to
make McMurtrie defensive coordinator. In 1994, McMurtrie's coaching contract was renewed.
In the spring of 1994, after two seasons of winning only one game Riley resigned and was
replaced by Gerald Hill. If Johnson had been motivated to retaliate, this was a perfect

---

[8]Assuming the speech in question had involved a matter of public rather than private
concern, the court would be required to weigh McMurtrie's free speech interests against the
Board's interest in promoting the efficiency of the public service it performs through its employees
at Coffee High School. *See Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968). The court cannot
resolve this issue in favor of defendants. McMurtrie did not teach at Coffee High School. His
criticisms of Johnson, while unquestionably personal, were made privately to the Superintendent
which minimized disruption. For these reasons, McMurtrie's free speech interests weigh more
heavily than the Board's interest in promoting the efficiency of the public service it performs
through its employees.

- 13 -

opportunity. Again, however, McMurtrie's contract was renewed. Johnson said nothing at all to Hill, the new athletic director and head football coach, about McMurtrie. In the fall of 1994, McMurtrie continued to serve as defensive coordinator.

Hill, who knew nothing of the McMurtries' conferences with the Superintendents opposing Johnson, says he became dissatisfied with McMurtrie's service as defensive coordinator in the fall of 1994. In the spring of 1995, he removed McMurtrie from the coordinator position and later asked Johnson to remove McMurtrie as a football coach. After the removal, McMurtrie did not seek reinstatement as an assistant football coach due to the fact that Hill was still head coach. Plaintiff acknowledged that "it would be very difficult for us to work one with the other." (Pl.'s Dep. at 217).

In 1995, several parents and players complained about McMurtrie's coaching style in baseball. (*See* Dep. Excerpts of Marilyn Burleson, Jeff Quillen, Donna Morgan and Gerald Hill). Nevertheless, immediately prior to the May 15, 1995, meeting, Hill recommended renewing McMurtrie as baseball coach. (Hill Dep. at 213). After meeting with McMurtrie, however, Hill changed his mind. In this meeting, McMurtrie told Hill that he had no respect for him, and Hill told McMurtrie that he was a backstabber. McMurtrie proposed bypassing Hill and reporting directly to Johnson. Hill found this unacceptable. Hill told McMurtrie and later Johnson that, as far as he was concerned, McMurtrie would not coach anything. McMurtrie believed at the time that Hill, not Johnson, was the real culprit and that he did not believe he could work with Hill. Johnson followed his athletic director's recommendation that McMurtries coaching contract not be renewed.

After receiving the recommendation that McMurtrie's coaching contract not be renewed from both Hill and Johnson, Barney recommended non-renewal to the Board. By plaintiff's own admission, he could not work with Hill, the athletic director. The impetus for the baseball and football non-renewal came from Hill who knew nothing of the McMurtries' statements to Taylor and Barney. Given McMurtrie's renewals in 1993 and 1994, his service as coach in 1994 without objection, the parental and team criticisms in 1995, his heated meeting with Hill, his own strong views of Hill, the athletic director's recommendation to Johnson, Barney's reliance on Hill's views, and the two year time span between the speech and his non-renewal, no reasonable jury could conclude that McMurtrie's non-renewal was motivated by his speech. In sum, even if plaintiff's and his wife's statements to Taylor, and his wife's statements to Barney, were "protected speech", there is no evidence that this speech played *any*, much less a substantial, part in the decisions about which plaintiff complains. Finally, there is substantial evidence that the defendant would have taken the same action with regard to plaintiff's employment even without the allegedly protected speech of the plaintiff and his wife.

### B. JOHNSON AS FINAL POLICYMAKER

The Board next argues that McMurtrie's claim under 42 U.S.C. § 1983 fails because Johnson did not have final policymaking authority and his decision to recommend non-renewal was subject to meaningful administrative review. McMurtrie does not argue that Barney or the Board retaliated. Instead, he claims they simply gave in to Johnson's wishes. Municipalities, however, "may only be held liable under § 1983 for the execution of governmental policy or custom." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997), *citing Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). An official such as Johnson "does not have final

policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro*, 117 F.3d at 514.

McMurtrie claims that Barney always followed the recommendations of his principals and the Board followed the recommendation of the superintendent. However, giving "substantial deference to the original decision maker" is insufficient to convert the original decision to governmental policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Here, Barney called in both Hill and Johnson and made his recommendation to the Board based upon the concurrence of both. The Board required Johnson to explain the decision. The record reflects that Board members sometimes oppose recommendations of the superintendent. Under Alabama law the Board makes personnel decisions based upon the recommendation of the superintendent. *Ala. Code § 16-12-16* (1975). However, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority." *Mandel v. Doe*, 888 F.2d 783, 192 (11th Cir. 1989).

In this case, both Superintendent Barney and the Board reviewed Johnson's decision in a meaningful way. Under these circumstances, assuming Johnson was improperly motivated, the Board can be liable only if, after review, it approved his decision and the basis for it. *Hill v. Clifton*, 74 F.3d 1150, 1152 (llth Cir. 1996). Here, McMurtrie does not even contend that Barney or the Board approved of Johnson's alleged retaliatory basis for the decision. Because Johnson's decision was subject to meaningful review, he was not a final policymaker. Moreover, the Board's approval was not based upon Johnson's alleged retaliatory motive. Therefore, the Board is not liable to McMurtrie under Section 1983 and is due judgment as a matter of law.

- 16 -

## C. QUALIFIED IMMUNITY

Defendant Johnson is also entitled to summary judgment on grounds of qualified immunity. Qualified immunity is exceedingly broad in scope. Indeed, it protects all but the plainly incompetent or one who was knowingly violating the law. *Lassiter v. Alabama A & M University Board of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1993). The test to determine whether a government official is entitled to qualified immunity involves a two-step analysis. First, the government official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If the defendant satisfies this burden, the burden shifts to the plaintiff to show lack of good faith. To meet this burden, the plaintiff must show that the official's actions violated clearly established constitutional law. *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).

Johnson has established the first prong of the test. Johnson was the principal at Coffee High School. As principal, one of his responsibilities is to recommend non-renewal of coaching supplements. McMurtrie does not contend that Johnson was acting outside the scope of his discretionary authority.

Since Johnson has shown that he was acting within his authority, the burden then shifts to McMurtrie to show lack of good faith on the part of Johnson. In *Gomez v. Toledo*, 446 U.S. 635 (1980), the Supreme Court held that a defendant who seeks qualified immunity must plead good faith as an affirmative defense. Subsequent cases have affirmed this principal. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Johnson asserts that he acted in good faith within the meaning of *Harlow v. Fitzgerald, supra*, and its progeny and is entitled to qualified immunity for that reason. McMurtrie may not discharge his burden by referring to general rules or to the

- 17 -

violation of abstract rights. *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998). Clearly, all employees have a right to be free from retaliation for exercising First Amendment rights. However, in order to survive a motion for summary judgment with regard to qualified immunity, the plaintiff must establish that, as a matter of law, the defendant's conduct violated clearly established law at the time defendant acted against the plaintiff: "[f]or the law to be clearly established . . . , the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Lassiter*, 28 F.3d at 1149. The Eleventh Circuit has also held that "defendants who allegedly violate public employees' First Amendment freedoms rarely act within 'clearly established' contours of law." *Hanson v. Soldenwagner*, 19 F.3d 573, 575 (11th Cir. 1994).

Qualified immunity is the usual rule and "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Lassiter*, 28 F.3d at 1149. "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Id.* at 1149. "[I]n this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U. S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Wilson*, 156 F.3d at 1135. When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts in the immediate case, but they need to be "materially similar." *Lassiter*, 28 F.3d at 1150. "For qualified immunity to be surrendered, pre-existing law must

dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent, that what the defendant is doing violates federal law *in the circumstances.*"  *Id.* [9]  Here McMurtrie cites no case with facts that would demonstrate that defendant Johnson's conduct violated "clearly established" law.

The Eleventh Circuit has addressed the issue of qualified immunity in several cases analogous to the case before the court.  For example, in *Dartland v. Metropolitan Dade County*, 866 F.2d 1321 (11th Cir. 1989), a county consumer advocate brought a Section 1983 action against the county manager alleging that his dismissal was in retaliation for exercising his First Amendment right to free speech.  The plaintiff was fired after making statements critical of his employer to a local newspaper reporter.  The court stated that there "will rarely be a basis for [an] *a priori* judgment that the termination or discipline of a public employee violated 'clearly

---

[9]Since *Lassiter*, Eleventh Circuit decisions have required an even more detailed inquiry into prior law.  For example, in *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994), the Court stated:

> The question in this case is not whether, in general, involuntarily committed patients have a legally cognizable interest under the Fourteenth Amendment to safe conditions.  They do.  Instead, the question, in this case, as in all qualified immunity cases is fact specific:  in May 1991, was it clearly established in [the Eleventh] Circuit that it was unconstitutional for a mental institution to fail to supervise a patient for fifteen minutes in the smoking room, when she was on close watch for a health problem, when the institution had a history of some "sexual contact" involving patients other than plaintiff but no history of rape for the past twelve years, where a previous patient who was to be similarly monitored disappeared, apparently escaped through a bathroom window, and fell to her death on a ledge below, and where the plaintiff had never before complained of unwanted sexual contact from either the patient accused, and any other patient, or any member of the staff?

The *Rodgers* case illustrates the type of narrow, fact-specific development of the law necessary to lose qualified immunity.

established' constitutional rights." *Dartland*, 866 F.2d at 1323(citations omitted). According to the court, "[b]ecause no bright-line standard puts the reasonable public employer on notice of as constitutional violation," public employers are almost always entitled to qualified immunity. *Id.* Consistent with these assertions, the court reversed a denial of summary judgment, holding that a reasonable person in defendant's position could have concluded that the plaintiff's termination was constitutionally permissible.

In *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996), the plaintiff sued various state officials alleging that their prejudice against the plaintiff's religion caused them to violate the plaintiff's freedom of religion and his right to freedom of association and freedom of speech. These torts require proof of discriminatory intent. The Eleventh Circuit said qualified immunity is too important a right to be nullified whenever discriminatory intent appears as an element of the underlying constitutional tort. *Id.* at 1533. The court emphasized that the purpose of qualified immunity is to prevent public officials from being intimidated in doing their jobs. *Id.* at 1534. The court said that officials are able to act without fear of harassing litigation only when they can reasonably anticipate before they act or do not act if their conduct will give rise to damage liability. *Id.* To avoid qualified immunity for a defendant, a plaintiff must prove that it was clearly established as a matter of law that the defendant could not act as he did.

Johnson recommended non-renewal two years after the speech at issue and only after parental and student complaints. He was present when a blow-up between McMurtrie and Hill, the school's athletic director, occurred. Hill recommended McMurtrie's nonrenewal. At the very least, Johnson, when considering these facts, could have considered his decision lawful. Because Johnson did not act in violation of clearly established law, he is entitled to qualified immunity.

- 20 -

## CONCLUSION

For the foregoing reasons, the court holds that plaintiff has raised no genuine issue of

material fact and defendants are entitled to judgment as a matter of law.  Accordingly, defendants'

Motion for Summary Judgment is due to be granted.

An Order granting defendants' Motion for Summary Judgment will be entered

contemporaneously herewith.

**DONE** this _llk_ day of March, 1999.


**SHARON LOVELACE BLACKBURN**
United States District Judge